# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANA MCMASTER, | Case No. 1:10-cv-01407-AWI-SKO (PC) |
| Plaintiff, | ORDER DENYING MOTIONS TO STRIKE DECLARATIONS |
| v. | (Docs. 90 and 92-3) |
| M. E. SPEARMAN, et al., | FINDINGS AND RECOMMENDATIONS RECOMMENDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BE DENIED IN PART AND CONTINUED IN PART PURSUANT TO RULE 56(D) |
| Defendants. | |
| | (Doc. 65) |
| _____/ | OBJECTION DEADLINE: FIFTEEN DAYS RESPONSE DEADLINE: FIFTEEN DAYS |

## Order and Findings and Recommendations

### I.     Procedural History

Plaintiff Dana McMaster ("Plaintiff"), a state prisoner proceeding pro se and in forma pauperis, filed this civil rights action pursuant to 42 U.S.C. § 1983 on August 6, 2010.  This action is proceeding on Plaintiff's second amended complaint, filed January 3, 2013, against Defendants Carlson, Garcia, Sedwick, Espitia,[1] and Pease[2] for failing to protect him, in violation of the Eighth Amendment, and against Defendant Carlson for retaliation, in violation of the First Amendment.

---

[1] Originally named as John Doe 2.

[2] Originally named as John Doe 1.

1   The events giving rise to Plaintiff's federal constitutional claims occurred between March 7, 2009,

2   and April 20, 2009, at Pleasant Valley State Prison ("PVSP") in Coalinga, California.

3       On November 14, 2013, Defendants Carlson, Garcia, Sedwick, and Espitia ("Defendants")

4   filed a motion for summary judgment.[3]  On June 16, 2014, following what appeared to be final

5   resolution of the outstanding discovery disputes, Plaintiff was ordered to file an opposition or a

6   statement of non-opposition within forty-five days.[4]  Plaintiff filed an opposition on August 7,

7   2014, and a motion to strike Defendant Carlson's declaration on August 11, 2014.  Defendants

8   filed a reply on August 15, 2014, accompanied by evidentiary objections and a motion to strike

9   declarations or portions therein.

10      Defendants' motion for summary judgment has been submitted upon the record without

11  oral argument, and the Court now issues the following (1) order and (2) findings and

12  recommendations.  Local Rule 230(*l*).

13  **II.    Summary Judgment Standard**

14      Any party may move for summary judgment, and the Court shall grant summary judgment

15  if the movant shows that there is no genuine dispute as to any material fact and the movant is

16  entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted);

17  *Washington Mut. Inc. v. U.S.*, 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether

18  it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of

19  materials in the record, including but not limited to depositions, documents, declarations, or

20  discovery; or (2) showing that the materials cited do not establish the presence or absence of a

21  genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.

22  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider other materials in the

23  record not cited to by the parties, although it is not required to do so.  Fed. R. Civ. P. 56(c)(3);

24

25  [3] Plaintiff identified John Doe 1 as S. Pease on March 20, 2014, and Defendant Pease filed an answer on August 25,
    2014.  (Docs. 68, 79, 85, 93.)  To avoid unnecessary confusion, Pease will be referred to herein as Officer Pease given
26  that he was a John Doe escorting officer at the time the other defendants filed their motion.

27  [4] Concurrently with their motion for summary judgment, Defendants served Plaintiff with the requisite notice of the
    requirements for opposing the motion.  *Woods v. Carey*, 684 F.3d 934, 939-41 (9th Cir. 2012); *Rand v. Rowland*, 154
28  F.3d 952, 960-61 (9th Cir. 1998).  (Doc. 65-2.)

1   *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); *accord*

2   *Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010).

3          Defendants do not bear the burden of proof at trial and in moving for summary judgment,

4   they need only prove an absence of evidence to support Plaintiff's case.  *In re Oracle Corp. Sec.*

5   *Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106

6   S.Ct. 2548 (1986)).  If Defendants meet their initial burden, the burden then shifts to Plaintiff "to

7   designate specific facts demonstrating the existence of genuine issues for trial."  *In re Oracle*

8   *Corp.*, 627 F.3d at 387 (citing *Celotex Corp.*, 477 U.S. at 323).  This requires Plaintiff to "show

9   more than the mere existence of a scintilla of evidence."  *Id.* (citing *Anderson v. Liberty Lobby,*

10  *Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505 (1986)).

11         However, in judging the evidence at the summary judgment stage, the Court may not make

12  credibility determinations or weigh conflicting evidence, *Soremekun v. Thrifty Payless, Inc.*, 509

13  F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all

14  inferences in the light most favorable to the nonmoving party and determine whether a genuine

15  issue of material fact precludes entry of judgment, *Comite de Jornaleros de Redondo Beach v.*

16  *City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted),

17  *cert. denied*, 132 S.Ct. 1566 (2012).  The Court determines *only* whether there is a genuine issue

18  for trial and in doing so, it must liberally construe Plaintiff's filings because he is a pro se

19  prisoner.  *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations

20  omitted).

21  **III.    Evidentiary Objections**

22         As an initial matter, the parties filed objections and motions to strike declarations.  The

23  Court rules generally as follows.  *See Oyarzo v. Tuolumne Fire Dist.*, 955 F.Supp.2d 1038, 1052

24  n.1 (E.D.Cal. 2013) ("It is not this Court's practice to rule on evidentiary matters individually in

25  the context of summary judgment, unless otherwise noted."); *Capital Records, LLC v. BlueBeat,*

26  *Inc.*, 765 F.Supp.2d 1198, 1200 n.1 (C.D.Cal. 2010); *Burch v. Regents of Univ. of California*, 433

27  F.Supp.2d 1110, 1118-22 (E.D.Cal. 2006).

28  ///

1    **A.    Hearsay**

2        "At summary judgment, a party does not necessarily have to produce evidence in a form

3    that would be admissible at trial." *Nevada Dep't of Corr. v. Greene*, 648 F.3d 1014, 1019 (9th

4    Cir. 2011) (citing *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001)) (internal

5    quotations omitted).   The focus is on the admissibility of the evidence's contents, not its form.

6    *Fonseca v. Sysco Food Servs.of Arizona, Inc.*, 374 F.3d 840, 846 (9th Cir. 2004); *Fraser v.*

7    *Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *Cheeks v. General Dynamics*, __ F.Supp.2d __, __,

8    2014 WL 2048058, at *8 (D.Nev. 2014); *Burch*, 433 F.Supp.2d at 1122.   Therefore, unless

9    otherwise specifically addressed herein, Defendants' hearsay objections are overruled.   *E.g.*,

10   *Fonseca*, 374 F.3d at 846; *Burch*, 433 F.Supp.2d at 1122.

11       Additionally, the John Doe officer who escorted inmate Smedley to Plaintiff's cell on

12   March 18, 2009, was named as a defendant in the second amended complaint and Plaintiff

13   subsequently identified him as S. Pease.   Officer Pease subsequently waived service and filed an

14   answer.   According, Officer Pease's statements are not hearsay, as Defendants argue in their

15   motion, but opposing party statements. Fed. R. Evid. 801(d)(2)(A).

16   **B.    Relevancy**

17       Given the Court's duty to determine whether there exists a genuine dispute as to any

18   *material* fact, an independent evidentiary objection to evidence as irrelevant is both unnecessary

19   and unhelpful.   *E.g.*, *Carden v. Chenega Sec. & Protections Servs., LLC*, No. CIV 2:09-1799 WBS

20   CMK, 2011 WL 1807384, at *3 (E.D.Cal. May 10, 2011); *Arias v. McHugh*, No. CIV 2:09-690

21   WBS GGH, 2010 WL 2511175, at *6 (E.D.Cal. Jun. 17, 2010); *Tracchia v. Tilton*, No. CIV S-06-

22   2916 GEB KJM P, 2009 WL 3055222, at *3 (E.D.Cal. Sept. 21, 2009); *Burch*, 433 F.Supp.2d at

23   1119.   Defendants' objections on relevancy grounds are therefore disregarded.

24   **C.    Authentication of Documents**

25       Unauthenticated documents cannot be considered in a motion for summary judgment, *Las*

26   *Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 533 (9th Cir. 2011) (citing *Orr v. Bank of America,*

27   *NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002)) (quotation marks omitted), and therefore, lack of

28   proper authentication can be an appropriate objection where the document's authenticity is

genuinely in dispute.  However, an inquiry into authenticity concerns the genuineness of an item of evidence, not its admissibility, *Orr*, 285 F.3d at 776, and documents may be authenticated by review of their contents if they appear to be sufficiently genuine, *Las Vegas Sands, LLC*, 632 F.3d at 533 (citing *Orr*, 285 F.3d at 778 n.24) (quotation marks omitted).

The characteristics of prison records - appearance, contents, and substance - easily support a finding that the documents have been authenticated by their distinctive characteristics and that they are what they appear to be: official prison records.  Fed. R. Evid. 901(b)(4); *Las Vegas Sands, LLC*, 632 F.3d at 533; *see also Abdullah v. CDC*, No. CIV S-06-2378 MCE JFM P, 2010 WL4813572, at *3 (E.D.Cal. Nov. 19, 2010) (finding an objection for lack of foundation and authentication unavailing where the records were from the plaintiff's prison file and they were created and maintained by prison officials); *Sanchez v. Penner*, No. CIV S-07-0542 MCE EFB P, 2009 WL 3088331, at *5 (E.D.Cal. Sept. 22, 2009) (overruling lack of foundation and proper authentication objections to prison medical records submitted by the plaintiff); *Johnson v. Roche*, No. CIV S-06-1676 GEB EFB P, 2009 WL 720891, at *6 (E.D.Cal. Mar. 13, 2009) (overruling lack of foundation and proper authentication objections to prison records); *Burch*, 433 F.Supp.2d at 1119 (overruling objections to the introduction of documentary evidence where the defendants did not actually dispute the authenticity of them and where the plaintiff would be able to authenticate them at trial).

If Defendants genuinely disputed the authenticity of a particular prison record, they could have made a more specific objection.  Notably, they did not and their bare objection to Plaintiff's use of prison records for lack of proper authentication is overruled.  Fed. R. Evid. 901(b)(4); *Las Vegas Sands, LLC*, 632 F.3d at 533.

### D.   **Defendants' Motion to Strike Declarations**

Defendants move to strike portions of Plaintiff's declaration and attached exhibits, and the declarations of inmates Ferraiz, Kearnes, and Zuber on the ground that they are inadmissible based on failure to comply with Fed. R. Civ. P. 56(c)(4).  (Doc. 92-3.)  The Court declines to strike the declarations or portions therein based on Defendants' relevancy objection.  Irrelevant information cannot create a triable issue of material fact, and the Court finds it unnecessary to undertake

striking portions of declarations merely because they arguably lack relevancy.  *E.g.*, *Burch*, 433 F.Supp.2d at 1119.

Next, as discussed above, hearsay is not subject to exclusion at the summary judgment stage if it can be offered at trial in an admissible form.  *E.g.*, *Greene*, 648 F.3d at 1019; *Fonseca*, 374 F.3d at 846.

Finally, "personal knowledge and competence to testify . . . may be inferred from the affidavits themselves."  *Barthelemy v. Air Line Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990) (per curiam).  Defendants' argument that inmate Kearnes lacks personal knowledge Plaintiff was attacked by an orientation inmate (Smedley) is merely speculative, and such an argument does not render the evidence inadmissible.  *Greene*, 648 F.3d at 1020; *see also Strong v. Valdez Fine Foods*, 724 F.3d 1042, 1045 (9th Cir. 2013).  In any event, the Court need not and does not rely on inmate Kearnes' statement that Plaintiff was attacked by an orientation inmate in determining the existence of triable issues of fact, as there is other evidence in the record regarding the attack.

Accordingly, Defendants' motion to strike is denied.

### E.   Plaintiff's Motion to Strike Defendant Carlson's Declaration

Plaintiff moves to strike Defendant Carlson's declaration on the ground that it contains false statements and was filed in bad faith.  Fed. R. Civ. P. 56(h).  (Doc. 65-9, Carlson Dec.) While Defendant Carlson incorrectly described the officer who initially responded to Plaintiff's call for help on March 18, 2009, as male, and it is undisputed that Defendant Sedwick, who is female, was the initial responding officer, there is insufficient support for a finding that the error was made intentionally and in bad faith.  Furthermore, no prejudice arises from the error in light of the fact that both sides agree on the identity of the initial responding officer.

Next, the parties agree that Defendant Sedwick was the only officer in the housing unit when inmate Smedley arrived, she activated her personal alarm when Plaintiff called for help, and other officers responded to the scene less than one minute after Sedwick reached Plaintiff's cell. (Doc. 65-3, Def. Undisp. Facts 70-72.)  Acceptance of those facts as true does not render as implausible Defendant Carlson's attestation that he arrived at Plaintiff's cell shortly after the alarm sounded; there is no evidence Defendant Carlson could not have arrived at the cell within a minute

of hearing the alarm, along with other staff.  Plaintiff's position that Defendant Carlson did not come to his cell creates a disputed issue of fact; it is not proof of a false declaration filed in bad faith.  S*ee Raher v. Fed. Bureau of Prisons*, No. 03:09-cv-00526-ST, 2011 WL 4832574, at *7-8 (D.Or. 2011) (even affidavit testimony materially contradicted by prior deposition testimony insufficient to show bad faith); *Rielly v. D.R. Horton, Inc.*, No. SACV 06-0867 AG (ANx), 2008 WL 4330299, at *3 (C.D.Cal. 2008) (mere inconsistencies between statements in declaration offered by moving party and the nonmoving party's evidence do not rise to level of falsehoods made in bad faith).

Finally, with respect to the other statements in Defendant Carlson's declaration, the fact that the parties disagree on facts and their declarations contradict one another is not surprising, and Plaintiff may not use his own statements under penalty of perjury as proof that Defendant Carlson's statements under penalty of perjury are false.  Mere dueling declarations do not evidence bad faith, and it will be for the trier of fact to weigh evidence and assess witness credibility.  *George v. Edholm*, 752 F.3d 1206, 1214 (9th Cir. 2014); *Thomas*, 611 F.3d at 1149.

Therefore, Plaintiff's motion to strike Defendant Carlson's declaration is denied.

## IV.     Eighth Amendment Claim Against Defendants Sedwick and Espitia

### A.     Summary of Plaintiff's Allegations[5]

On March 7, 2009, Plaintiff, who was housed on Facility C at PVSP, was threatened by an inmate named Dan, who told Plaintiff that Officer Rocha gave him some information and if it was true, Plaintiff was a dead man.[6]  Around 6:15 p.m., Plaintiff reported the threat to Officer Vang and said he wanted off the yard due to his fear for his safety.[7]

Officer Vang escorted Plaintiff to the Facility C program office, where Defendant Garcia, Sergeant Mendez, Lieutenant Ladd, and Officer Smyth were present.  Plaintiff told them inmate

---

[5] Plaintiff's second amended complaint is verified, and contentions set forth in verified pro se pleadings, motions, and/or oppositions constitute evidence where the contentions are based on personal knowledge of facts admissible in evidence.  *Jones v. Blanas*, 393 F.3d 918, 922-23 (9th Cir. 2004).

[6] Yard and facility are used interchangeably in the record.  During the relevant events, Plaintiff was housed on C Yard or Facility C, a general population or "mainline" yard.

[7] Identified as Officer Vane in Plaintiff's deposition and Defendants' statement of undisputed facts.

1  Dan had threatened his life over some information Officer Rocha gave him, and Plaintiff requested

2  protective custody and placement on a Sensitive Needs yard.  Around 7:30 p.m., Defendant Garcia

3  told Plaintiff that Administrative Segregation ("AdSeg") was full so Plaintiff would be retained on

4  C Facility until a cell in AdSeg became available.

5       Plaintiff was concerned about his safety on the yard because inmate Dan was a shot caller

6  for the "skins" and had "homeboys" on the yard, but Defendant Garcia told him, "Don't worry Mr.

7  McMaster[,] we log every cell assignment in the program office log book[;] that way everyone

8  knows about your lockup order.  We send a copy to the building 5 officers so they know you are

9  on control feed status.  We also put a sign on the door."  (Doc. 20, 2nd Amend. Comp., ¶24.)

10  Defendant Garcia wanted to assign Plaintiff the upper bunk in cell 143 in Building 3, but Plaintiff

11  declined that assignment because he had a bad ankle and walked with a cane, leaving him unable

12  to get up and down from the upper bunk.  Plaintiff alleges that Defendant Garcia was upset when

13  he declined cell 143.

14       Plaintiff was subsequently escorted back to Building 5 by Officer Smyth.  When Plaintiff

15  again expressed concern over his safety because inmate Dan had homeboys in Building 5, Officer

16  Smyth showed Plaintiff some papers he had and told Plaintiff, "Don't worry these tell the building

17  officers what to do."  (*Id.*)  When they entered the building, Officer Smyth spoke with the tower

18  officer, put some papers in the tower's bucket, and told Officer Speers, "McMaster has locked

19  up."  (*Id.*)  Defendant Sedwick, who was on duty in Building 5, then took Plaintiff to cell 214.

20  (Doc. 86, McMaster Dec., ¶13.)

21       Between March 8, 2009, and March 18, 2009, Officer Moorlock and his two partners on

22  second watch, and Defendant Sedwick, Defendant Espitia, and Officer Speers on third watch were

23  involved in controlled feeding of the inmates in Building 5.  At no time were other inmates

24  allowed near Plaintiff's cell door when Defendant Espitia opened it to pass Plaintiff his tray,

25  demonstrating Building 5 correctional officers' awareness of the circumstances of his assignment

26  to cell 214.

27       On March 18, 2009, at approximately 7:30 p.m., Officer Pease knocked on Plaintiff's cell

28  door and informed Plaintiff they were putting inmate Smedley in his cell.  Plaintiff objected

8

because he was supposed to be separated from "mainline" inmates and was "Ad/Seg pending." (2nd Amend. Comp., ¶28.)  Plaintiff told Officer Pease to check with the program office and Pease said, "They sent him over here."  (*Id.*)  Plaintiff told Officer Pease to check the sign on his door, and Officer Pease said it read "CTQ."[8]  (*Id.*)  Officer Pease tapped the cell door to signal it be opened and Plaintiff said, "You can't put him in here, go ask Sedwick."  (*Id.*)  Officer Pease said, "I did," and pushed Smedley in the cell.  (*Id.*)  Inmate Smedley said there was no mattress and Officer Pease told him not to worry about it.  Almost immediately, inmate Smedley swung at Plaintiff and then grabbed Plaintiff's cane and "wailed" on him with it, injuring him.  (*Id.*)

Plaintiff yelled for help from his cell door.  Defendant Sedwick pressed her personal alarm and ran up the stairs.  When inmate Smedley saw Defendant Sedwick outside the cell, he stopped hitting Plaintiff, threw the cane on the shelf, and sat down.  A minute later, other officers joined Defendant Sedwick, and Plaintiff was taken to the yard's medical clinic.

## B. <u>Legal Standard</u>

The Eighth Amendment protects prisoners from inhumane methods of punishment and from inhumane conditions of confinement.  *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006).  Although prison conditions may be restrictive and harsh, prison officials must provide prisoners with food, clothing, shelter, sanitation, medical care, and personal safety.  *Farmer v. Brennan*, 511 U.S. 825, 832-33, 114 S.Ct. 1970 (1994) (quotations omitted).  Prison officials have a duty to protect prisoners from violence at the hands of other prisoners because being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society.  *Farmer*, 511 U.S. at 833-34 (quotations omitted); *Clem v. Lomeli*, 566 F.3d 1177, 1181 (9th Cir. 2009); *Hearns v. Terhune*, 413 F.3d 1036, 1040 (9th Cir. 2005).  However, prison officials are liable under the Eighth Amendment only if they demonstrate deliberate indifference to conditions posing a substantial risk of serious harm to an inmate.  *Farmer*, 511 U.S. at 834, 841 (quotations omitted); *Clem*, 566 F.3d at 1181; *Hearns*, 413 F.3d at 1040.

///

///

---

[8] Confined to quarters.

9

1    **C.      Discussion**

2          **1.      Undisputed Facts**

3          During the time of the events in question, Plaintiff was in the custody of the California

4    Department of Corrections and Rehabilitation ("CDCR") at PVSP.  Plaintiff has been in CDCR's

5    custody for over sixteen years, and was at PVSP for approximately twelve years.  Prior to March

6    2009, Plaintiff had been in only one fight while housed at PVSP, and it was because he and

7    another inmate had an argument over money.

8          Inmates are expected to have cellmates, whether they are housed in a Reception Center,

9    General Population, AdSeg, a Security Housing Unit, or a specialty housing unit.  Inmates are not

10   entitled to have a cell without a cellmate, the housing location of their choice, or the cellmate of

11   their choice.  Inmates who can demonstrate a history of in-cell abuse, in-cell violence towards a

12   cellmate, predatory behavior towards a cellmate, or being the victim of predatory behavior at the

13   hands of a cellmate may be considered for single-cell status, but an inmate must have current

14   documentation of his single-cell status to avoid receiving a cellmate.

15         In 2009, each facility or yard at PVSP had multiple housing buildings or housing units, and

16   each facility had an orientation building.  On March 7, 2009, Plaintiff was housed in cell 228L in

17   C Facility, Building 1.[9]  C Facility or C Yard at PVSP was a General Population yard in March

18   2009, and prior to March 7, 2009, Plaintiff had been cleared to have a cellmate and he had one

19   while housed in cell 228L.

20         If an inmate has an "R suffix" on his "jacket," it means that he was convicted of a sexual

21   crime, and an inmate's "paperwork" will show whether he has an R suffix on his jacket.  Plaintiff

22   has an R suffix on his jacket from a conviction that occurred when he was a minor.

23         On March 7, 2009, inmate Dan approached Plaintiff in their housing unit, said that he

24   heard Plaintiff had an R suffix on his jacket, and told Plaintiff he was a dead man if it was true.

25   Inmate Dan also asked to see Plaintiff's paperwork.

26

27   _____

28   [9] Defendants stated Plaintiff was in cell 232, and Plaintiff stated he was in 228.  The cell number is not relevant, however, and the Court will accept 228 as the number for the purpose of this section.

1    After Plaintiff returned to his housing unit following the evening meal on March 7, 2009,

2   he told Correctional Officer Vane about the conversation he had with inmate Dan and said that

3   inmate Dan had threatened him.[10]   Plaintiff told Officer Vane that he had to "roll up off the yard"

4   or "PC up" because of inmate Dan's threat, which means be taken out of the general inmate

5   population, put in protective custody, and housed in a facility that does not house general

6   population inmates.  Plaintiff told Officer Vane that he needed to speak to a sergeant to discuss

7   inmate Dan's threat, and Officer Vane escorted Plaintiff to the C Facility program office so

8   Plaintiff could speak with Sergeant Mendez.

9    Plaintiff told Sergeant Mendez that inmate Dan threatened him and that he needed to roll

10  up off the yard because of safety concerns.[11]  On March 7, 2009, correctional officers searched

11  inmate Dan's cell for weapons while Plaintiff was in a holding cell in the C Facility program

12  office.  Plaintiff was told that he would be reassigned to a cell in AdSeg, but he was not rehoused

13  in AdSeg on March 7, 2009, because it was full.

14   Officers wanted to assign Plaintiff to cell 143 in C Facility, Building 3, with another

15  inmate who was also seeking protective custody.  However, Plaintiff said he could not be housed

16  in cell 143 on the upper bunk because he had a medical condition that prevented him from getting

17  on and off an upper bunk.  As a result, Plaintiff was assigned to cell 214 in C Facility, Building 5,

18  which is on the second level of the housing unit.  When Plaintiff was first assigned to cell 214, he

19  did not have a cellmate, and his cell door did not have a sign indicating that he was "AdSeg

20  pending."

21   Shortly after being assigned to cell 214, Plaintiff told Defendant Sedwick that he was in

22  214 because he was trying to roll up off the yard, but he did not mention inmate Dan or inmate

23  Dan's threats.

24   Between March 7, 2009, and March 18, 2009, Plaintiff never left his cell, and correctional

25  officers delivered Plaintiff's meals to his cell and kept all inmates away from his cell.

26  _____

[10] Identified as Officer Vang in the second amended complaint.

27
[11] Plaintiff purports to deny this fact but his denial is based on merely his desire to add more facts, which does not
28  bring this fact into dispute.

On March 18, 2009, inmate Smedley arrived at PVSP from San Quentin State Prison, and was escorted to Plaintiff's cell by Officer Pease.[12]   Plaintiff told Pease that he could not put Smedley in the cell because "I'm AdSeg pending" and "I'm to be separated from . . . the rest of the inmates" in C Facility.  When Officer Pease showed up at Plaintiff's cell with inmate Smedley, Plaintiff told him three times, "You can't put the guy in the cell with me."

Inmate Smedley knew that Plaintiff was seeking protective custody because when Smedley was in front of Plaintiff's cell with Officer Pease, Smedley heard Plaintiff pleading with Pease not to put Smedley in the cell, telling Pease that he was supposed to be separated from the rest of the inmates in C Facility and saying that he was trying to get into AdSeg.  As soon as inmate Smedley entered Plaintiff's cell, he asked Plaintiff why he was seeking AdSeg, and asked, "Did you PC up?"  Plaintiff responded to Smedley's questions by saying that he did what he had to do and that he had "PC'd up."  As soon as Plaintiff told Smedley that he did what he had to do and PC'd up, Smedley tried to punch Plaintiff, then took Plaintiff's cane and struck him with it in the head, back, legs, neck, and face approximately eleven to fifteen times.

Plaintiff moved to the cell door, saw Defendant Sedwick, hollered Sedwick's name, and yelled, "Help, man down."  Defendant Sedwick pressed her personal alarm, ran up the staircase, and came to Plaintiff's aid as soon as she heard Plaintiff yell man down and found the source of the call for help.  When Plaintiff yelled man down, Defendant Sedwick was the only officer in the building.  Other correctional officers responded to the scene less than one minute after Defendant Sedwick reached Plaintiff's cell.

Plaintiff remained assigned to cell 214, and inmate Smedley was assigned to cell 224 in the same housing unit as Plaintiff.  On March 24, 2009, Plaintiff was moved to the upper bunk in cell 143 of C Facility, Building 3, where he had a cellmate who was also a protective custody inmate pending AdSeg placement.  On March 25, 2009, Plaintiff was assigned to a cell in AdSeg, and he was subsequently assigned to a Sensitive Needs yard.

///

---

[12] At the time Defendants filed their motion, they referred to Pease simply as "the escorting officer, "as Plaintiff had not yet identified him as Pease.

## 2. **Objective Element of Eighth Amendment Claim**

To prevail on a claim for violation of the Eighth Amendment, an inmate must first show a deprivation which is objectively sufficiently serious. *Farmer*, 511 U.S. at 834. For a failure-to-protect claim, an inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.*

Defendants argue that speculative, generalized fear of harm does not rise to the level of an objectively substantial risk of serious harm, and in this case, there was no objective risk of harm to Plaintiff on March 18, 2009, from inmate Smedley because Smedley had just arrived to PVSP and did not know Plaintiff or his criminal history and Plaintiff's cell did not have a sign indicating Plaintiff was pending AdSeg placement. As a result, inmate Smedley had no reason to believe Plaintiff was anything other than a general population inmate, and it was not until Plaintiff told Smedley that he had "PC'd up" that Smedley attacked him.

Although Defendants argue correctly that the determination of the point at which a risk of harm becomes sufficiently substantial to implicate the Eighth Amendment has not been fleshed out, *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1050-51 (9th Cir. 2002) (citing *Farmer*, 511 U.S. at 834), a deprivation is sufficiently serious when a prison official's act or omission results in the denial of the minimal civilized measure of life's necessities, *Foster v. Runnels*, 554 F.3d 807, 812 (9th Cir. 2009). "The objective question of whether a prison officer's actions have exposed an inmate to a substantial risk of serious harm is a question of fact, and as such must be decided by a jury if there any room for doubt." *Lemire v. California Dep't of Corr. and Rehab.*, 726 F.3d 1062, 1075-76 (9th Cir. 2013) (citations omitted).

In this case, Plaintiff was a general population, or mainline, inmate for twelve years before the R suffix on his jacket caught up with him. (McMaster Depo., 20:10-12.) On March 7, 2009, inmate Dan, a shot caller for the skinheads, and another inmate, also a skinhead, confronted Plaintiff regarding whether he had an R suffix on his jacket and demanded to see his paperwork, which would have allowed them to verify the R suffix; and they warned him that if he had an R suffix, he was a dead man. (McMaster Depo., 20:10-12, 10:14-12:19; McMaster Dec., ¶8; 2nd Amend. Comp., ¶21.) Plaintiff in fact had an R suffix on his jacket and he told Officer Vang that

1   he had to "roll up off the yard" or "PC up," which meant he needed to be taken out of the general

2   inmate population, put in protective custody, and housed in a facility that does not house general

3   population inmates.   (McMaster Depo., 11:8-15, 14:1915:6; McMaster Dec., ¶9; 2nd Amend.

4   Comp., ¶22.)

5       Plaintiff also testified that in prison, general population inmates are "on call" to attack

6   protective custody inmates and if they violate that code, they themselves cannot stay on the yard.

7   (McMaster Depo., 63:11-64:7.)   As a result, if a general population inmate is celled with a

8   protective custody inmate, prison code obligates the general population inmate to attack the

9   protective custody inmate.   (McMaster Depo., 64:1-7; McMaster Dec., ¶11.)

10      Finally, Plaintiff testified that he "ratted" on inmate Dan for threatening him in order to

11  secure protective custody status, which further exacerbated the situation.   (McMaster Depo., 17:5-

12  9, 25:21- 25; McMaster Dec., ¶¶11, 26.)

13       This evidence clearly suffices to raise a triable issue of fact regarding whether Plaintiff

14  faced a substantial risk of serious harm from the general population inmates on his yard once his R

15  suffix was discovered, he "PC'd up," and he "ratted" on inmate Dan.   *See Lemire*, 726 F.3d at

16  1075-76.   Accordingly, the Court rejects Defendants' argument that Plaintiff did not face an

17  objectively substantial risk of serious harm.

18              **3.     Subjective Element of Eighth Amendment Claim**

19      The second element of an Eighth Amendment claim is subjective deliberate indifference,

20  which involves two parts.   *Lemire*, 726 F.3d at 1078.   Plaintiff must demonstrate first that the risk

21  was obvious or provide other circumstantial evidence that Defendants were aware of the

22  substantial risk to his safety, and second that there was no reasonable justification for exposing

23  him to that risk.   *Id.* (citing *Thomas*, 611 F.3d at 1150) (quotation marks omitted).

24      "[A] prison official cannot be found liable under the Eighth Amendment for denying an

25  inmate humane conditions of confinement unless the official knows of and disregards an excessive

26  risk of inmate health or safety; the official must both be aware of the facts from which the

27  inference could be drawn that a substantial risk of serious harm exists, and he must also draw the

28  inference."   *Farmer*, 511 U.S. at 837.   "[A]n official's failure to alleviate a significant risk that he

1   should have perceived but did not, while no cause for commendation, cannot . . . be condemned as

2   the infliction of punishment." *Id.* at 838.  However, prison officials are not free to ignore obvious

3   dangers to inmates. *Farmer*, 511 U.S. at 842; *Foster*, 554 F.3d at 814.  Prisoners "need not show

4   that a prison official acted or failed to act believing that harm actually would befall an inmate; it is

5   enough that the official acted or failed to act despite his knowledge of a substantial risk of serious

6   harm." *Farmer*, 511 U.S. at 842.  "Whether a prison official had the requisite knowledge of a

7   substantial risk is a question of fact subject to demonstration in the usual ways, including

8   inference from circumstantial evidence, and a factfinder may conclude that a prison official knew

9   of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842;

10  *Foster*, 554 F.3d at 814.

11          Defendants Sedwick and Espitia argue that even if Plaintiff faced a substantial risk of

12  serious harm to his personal safety, they did not act with deliberate indifference toward the risk.

13  After Plaintiff reported inmate Dan's threat against him, staff searched inmate Dan's cell and

14  moved Plaintiff to a different cell.  Between March 7, 2009, and March 18, 2009, Plaintiff did not

15  leave his cell and other inmates were kept away from his cell.  On March 18, 2009, Defendants

16  Espitia and Sedwick did not assign inmate Smedley to Plaintiff's cell, they did not escort inmate

17  Smedley to Plaintiff's cell, they had no part in placing inmate Smedley in Plaintiff's cell, and they

18  did not know and had never met or interacted with inmate Smedley until after he was placed in

19  Plaintiff's cell.[13]  (Espitia Dec., ¶¶4-6; Sedwick Dec., ¶¶5-8.)  Furthermore, Defendant Espitia was

20  not at work on March 18, 2009.  (Espitia Dec., ¶3.)

21

22

23  [13] Officer Pritchard, a correctional officer who was assigned to Central Control on March 18, 2009, attested in his
    declaration that inmates who arrive at PVSP by transportation bus, as Smedley did, are taken to Receiving and
24  Release ("R&R") where officers interview them and review their files.  (Doc. 65-5, Pritchard Dec., ¶4.)  R&R officers
    then notify Central Control how many inmates arrived, whether they have housing restrictions and whether they are
25  affiliated with any gangs.  (*Id.*, ¶7.)  Central Control then assigns the new inmates to cells within the orientation
    buildings, where they are housed until they can go before the classification committee for a hearing and receive their
26  classification score and custody designation.  (*Id.*, ¶¶8, 9.)  If the orientation buildings are full, inmates are housed in
    AdSeg buildings in A and D yards pending their classification hearing.  (*Id.*, ¶11.)  If the orientation buildings and the
27  AdSeg buildings are full, and the inmate's classification score and housing restrictions allow for general population
    housing, Central Control will assign the new arrival to a cell in one of the housing units pending a classification
28  committee hearing.  (*Id.*)

1    However, Plaintiff's version of events differs in some respects and his version must be

2    accepted as true for the purpose of resolving Defendants' motion.   *Comite de Jornaleros de*

3    *Redondo Beach*, 657 F.3d at 942; *Thomas*, 611 F.3d at 1149.

4    Specifically, leading up to March 18, 2009, Plaintiff was separated from the general

5    population inmates following inmate Dan's threat against him on March 7, 2009.  Because AdSeg

6    was full at the time, Plaintiff remained on Facility C, but he was single-celled and control fed in

7    his cell, and staff kept other inmates away from his cell.  Plaintiff expressed his concern over

8    remaining on Facility C more than once, but he was assured by staff that he would be kept safe,

9    and by March 18, 2009, everyone in the building knew he was confined to his cell for safety

10   reasons.  (McMaster Depo., 63:15-20; McMaster Dec., ¶15; Doc. 91, Pl. Ex. S-3, Attach. 1, court

11   record p. 87.)

12   On March 18, 2009, inmate Smedley, a skinhead general population inmate, arrived at

13   PVSP from San Quentin State Prison, and Plaintiff submits evidence that the GA Form 154

14   Inmate Transfer Form documenting Smedley's cell assignment had to be approved by a Facility C

15   lieutenant, sergeant, or higher classification.[14]  (McMaster Depo., 23:21 & 64:1-2; Doc. 86, Pl. Ex.

16   F-3, court record p. 66.)

17   Regardless whether the cell assignment originated in Central Control or the Facility C

18   program office, prison officials have a duty to ensure institutional safety and security, and Facility

19   C staff members assigned to Plaintiff's building were necessarily charged with that duty as related

20   to their building's safety and security.  *See Greene*, 648 F.3d 1018; *Walker v. Gomez*, 370 F.3d

21   969, 980 (9th Cir. 2004).  Whether Plaintiff's cell was marked CTQ or AdSeg pending, or whether

22   it was not marked at all, building staff were responsible for taking reasonable measures to

23   guarantee his safety, and it appears they did so between March 7, 2009, and March 25, 2009, with

24   the exception of the incident at issue on March 18, 2009.[15]  As such, there is evidence from which

25   
[14] Plaintiff's evidence indicates that rather than the cell assignment originating with Central Control as Defendants
26   contend, Central Control was *prohibited* from accepting a GA Form 154 Inmate Transfer Form that was not
     signed/approved by the Facility C lieutenant, sergeant, or higher classification.  (Pl. Ex. F-3.)

27   
[15] Defendant Espitia provided evidence that it had been the practice in early 2009 to put "AdSeg pending" signs on
28   cell doors, but Sergeant Athey instructed staff to instead put "CTQ" signs on cell doors.  (Doc. 86, court record p. 142,
     Pl. Ex. O, Sedwick Interrogatory Response 3.)

1  a reasonable trier of fact could find that staff members assigned to Plaintiff's building were aware

2  of Plaintiff's protective custody status and if they were not, they should have been.

3       Defendant Sedwick was the only officer in the housing unit when Officer Pease arrived

4  with inmate Smedley.  While Defendant Sedwick was not responsible for the cell assignment, she

5  was nevertheless aware that Plaintiff had been segregated from the general population inmates and

6  he was "rolling up" to a Sensitive Needs yard.  (McMaster Depo., 57:25-58:22; McMaster Dec.,

7  ¶13; Doc. 91, Pl. Ex. S-3, Attach. 1, court record p. 87.)   Furthermore, although Defendant

8  Sedwick denies knowing about the cell assignment ahead of time and her declaration suggests she

9  was handed the cell assignment paperwork only shortly before Plaintiff was attacked and called

10 for help, Plaintiff submitted evidence that Defendant Sedwick was aware of Officer Pease's arrival

11 in the unit with inmate Smedley and she was aware of the cell assignment prior to the time Pease

12 arrived at Plaintiff's cell door with Smedley.  (McMaster Depo., 27:20-28:4 & 57:3-25; McMaster

13 Dec., ¶¶ 15, 16.)

14      With respect to Defendant Espitia, although he attested he was not on duty on March 18,

15 2009, Plaintiff submitted evidence that Espitia was the control tower officer on duty when inmate

16 Smedley was placed in his cell and Espitia was the officer who opened his cell door for inmate

17 Smedley.  (McMaster Depo., 46:16-47:1 & 50:2-51:2; McMaster Dec., ¶16.)  Plaintiff argues that

18 Defendant Espitia had a duty to protect him from harm and because Espitia control fed him for a

19 week and a half, Espitia knew the circumstances of his placement in the cell.  (McMaster Depo.,

20 44:18-45:18.)  Plaintiff further argues that as the officer controlling the door, Defendant Espitia

21 should not have opened it and allowed a mainline inmate in with Plaintiff.  Instead, Defendants

22 Espitia should have intervened on Plaintiff's behalf.

23      The Court may not weigh the parties' evidence or assess their respective credibility, and

24 here there is evidence from which a reasonable jury could find that Defendants Sedwick and

25 Espitia were aware of Plaintiff's protective custody status on March 18, 2009, and were aware that

26 placing inmate Smedley, a newly arrived general population inmate, with Plaintiff, a protective

27 custody inmate, presented a substantial risk of serious harm to Plaintiff's safety.  *See Farmer*, 511

28 U.S. at 842; *Lemire*, 726 F.3d at 1078; *Foster*, 554 F.3d at 814; *Hearns*, 413 F.3d at 1041.  As

1   previously stated, the inquiry is factual and to the extent there circumstances which show the risk

2   was not obvious to Defendants Sedwick and Espitia or they acted reasonably despite the risk, that

3   determination is left to the trier of fact.  *Farmer*, 511 U.S. at 842; *Foster*, 554 F.3d at 814

4       Accordingly, the Court finds that Defendants Sedwick and Espitia are not entitled to

5   summary judgment and it recommends their motion be denied.

6       **D.**    **Qualified Immunity**

7       Defendants Sedwick and Espitia also argue they are entitled to qualified immunity.

8       Qualified immunity is "immunity from suit rather than a mere defense to liability; and like

9   an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."

10   *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009) (citation and internal quotations omitted).

11   Qualified immunity shields government officials from civil damages unless their conduct violates

12   "clearly established statutory or constitutional rights of which a reasonable person would have

13   known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982).  "Qualified immunity

14   balances two important interests - the need to hold public officials accountable when they exercise

15   power irresponsibly and the need to shield officials from harassment, distraction, and liability

16   when they perform their duties reasonably," *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct.

17   808 (2009), and it protects "all but the plainly incompetent or those who knowingly violate the

18   law," *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092 (1986).

19       In resolving the claim of qualified immunity, the Court must determine whether, taken in

20   the light most favorable to Plaintiff, Defendants' conduct violated a constitutional right, and if so,

21   whether the right was clearly established.  *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151

22   (2001); *Mueller*, 576 F.3d at 993.  While often beneficial to address in that order, the Court has

23   discretion to address the two-step inquiry in the order it deems most suitable under the

24   circumstances.  *Pearson*, 555 U.S. at 236 (overruling holding in *Saucier* that the two-step inquiry

25   must be conducted in that order, and the second step is reached only if the court first finds a

26   constitutional violation); *Mueller*, 576 F.3d at 993-94.

27   ///

28   ///

18

### 1.     Constitutional Violation

While Defendants argue that there was no objective risk of harm to Plaintiff's safety while he was housed in cell 214 and that they had no involvement in placing inmate Smedley with Plaintiff, the evidence viewed in the light most favorable to Plaintiff demonstrates a constitutional violation and there exist triable issues of fact as to whether that right was violated, as discussed above.  Specifically, once Plaintiff's sex offense conviction was discovered, he "PC'd" up, and he "ratted" on inmate Dan, he faced an objectively substantial risk of serious harm at the hands of general population inmates on Facility C.  While confining Plaintiff to his cell on March 7, 2009, and keeping other inmates away from his cell was an arguably reasonable response to the threat in light of the lack of bed space in AdSeg, at issue is what occurred on March 18, 2009, when inmate Smedley was celled with Plaintiff.  Defendants Sedwick and Espitia were working in Facility C, Building 5; they knew the circumstances of Plaintiff's cell assignment; and they were aware of inmate Smedley's arrival and assignment to Plaintiff's cell.  These facts, viewed from Plaintiff's perspective and accepted as true, suffice to demonstrate the violation of Plaintiff's rights under the Eighth Amendment.

### 2.     Clearly Established Right

Turning to the second step of the inquiry, "[f]or a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right."  *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508 (2002). While the reasonableness inquiry may not be undertaken as a broad, general proposition, neither is official action entitled to protection "unless the very action in question has previously been held unlawful."  *Hope*, 536 U. S. at 739.  "Specificity only requires that the unlawfulness be apparent under preexisting law," *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002) (citation omitted), and prison personnel "can still be on notice that their conduct violates established law even in novel factual circumstances," *Hope*, 536 U.S. at 741.

The existence of material factual disputes does not necessary preclude a finding of qualified immunity.  *Estate of Ford*, 301 F.3d at 1053.  "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions,"

*Ashcroft v. al-Kidd*, __ U.S. __, __, 131 S.Ct. 2074, 2085 (2011).  Here, the parties offer competing versions of events, but accepting Plaintiff's version of events as true, the duty to protect him from harm from other inmates had long been established by 2009, and no reasonable officer could have believed that it was appropriate to place a new general population inmate in the cell of a protective custody inmate who was being segregated from general population inmates for his own safety.  *Farmer*, 511 U.S. at 832-33; *Hearns*, 413 F.3d at 1040; *Leer v. Murphy*, 844 F.2d 628, 633-34 (9th Cir. 1988); *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986).

Accordingly, in light of the disputed issues of material fact in this case, Defendants Sedwick and Espitia are not entitled to qualified immunity.

## V.     Retaliation Claim Against Defendant Carlson

### A.     Summary of Allegations

On March 23, 2009, Plaintiff filed an inmate appeal regarding the incident in which inmate Smedley attacked him.  On April 20, 2009, Defendant Carlson interviewed Plaintiff about the appeal and told him, "Things will go alot [sic] easier for you in here if you sign off on this [a]ppeal."  (2nd Amend. Comp., ¶34.)  When Plaintiff refused, Defendant Carlson said, "Well then you better take some boxing lessons," which left Plaintiff "freaked out" and in fear of being set up for a hit.  (*Id.*)

### B.     Undisputed Facts

If an inmate wants to file an appeal, or grievance, against prison staff or complain about their conduct, he can file a 602 form.  Plaintiff filed a 602 form to complain about the conflict he had with inmate Smedley on March 18, 2009, and to complain about the conduct of several correctional officers that day.  In April 2009, Defendant Carlson interviewed Plaintiff to discuss the grievance Plaintiff filed concerning the events of March 18, 2009.  Plaintiff told Sergeant Carlson that he was not going to withdraw the 602, and he did not withdraw it.

### C.     Legal Standard

"Prisoners have a First Amendment right to file grievances against prison officials and to be free from retaliation for doing so."  *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012) (citing *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009)).  "Within the prison context, a

viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005); *accord Watison*, 668 F.3d at 1114-15; *Silva*, 658 at 1104; *Brodheim*, 584 F.3d at 1269.

### D.   Discussion

Defendant Carlson argues that he is entitled to judgment on Plaintiff's retaliation claim because he did not take adverse action against Plaintiff for bringing the appeal.  Defendant Carlson denies threatening Plaintiff or telling him to take boxing lessons, and he contends that even if he did make that statement, it did not rise to the level of adverse action.  (Carlson Dec., ¶8.) Defendant Carlson also argues that Plaintiff's rights were not chilled because he did not withdraw his appeal and telling a typical inmate to take boxing lessons would not have a chilling effect,

### 1.   Adverse Action

"'[A] retaliation claim may assert an injury no more tangible than a chilling effect on First Amendment rights,'" *Brodheim*, 584 F.3d at 1269-70 (quoting *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001)), and "the mere *threat* of harm can be an adverse action, regardless of whether it is carried out because the threat itself can have a chilling effect," *id.* at 1270 (emphasis in original).  Moreover, threats need not be explicit; "[t]he power of a threat lies not in any negative actions eventually taken, but in the apprehension it creates in the recipient of the threat." *Id.* at 1270-71.

Viewing the facts in the light most favorable to Plaintiff, he faced the threat of harm at the hands of general population inmates and he had been separated from them for his protection. Despite his segregation, a general population inmate was celled with him briefly and he was attacked almost immediately, a situation which Plaintiff believes was not accidental.  Thereafter, Plaintiff filed an appeal and on April 20, 2009, he was interviewed by Defendant Carlson, a circumstance which Plaintiff found objectionable given his belief that Carlson was involved in the placement of inmate Smedley in his cell.  (McMaster Depo., 40:12-22; McMaster Dec., ¶32.)

Defendant told Plaintiff things would go easier if he signed off on (withdrew) the appeal. (McMaster Depo., 41:1-11; McMaster Dec., ¶32.)  Plaintiff asked Defendant Carlson if that meant Carlson was going to put another "hit" on him and when he refused to withdraw the grievance, Carlson told him, "Well, you better take boxing lessons then."   (McMaster Depo., 41:13-20; McMaster Dec., ¶32.)

Plaintiff's evidence raises a triable issue of fact regarding whether Defendant Carlson told him to take boxing lessons when he refused to withdraw the appeal.   The argument that the statement was neither a threat nor sufficiently adverse to support a claim is untenable, as the statement clearly implies Plaintiff should get ready to defend himself from another fight. *Brodheim*, 584 F.3d at 1270-71.

## 2. <u>Chilling Effect</u>

Defendant Carlson's chilling argument is similarly unavailing.   Plaintiff's continued pursuit of his grievance is immaterial; Plaintiff need not "show that his speech was actually inhibited or suppressed, but rather that the adverse action at issue would chill or silence a person of ordinary firmness." *Brodheim*, 584 at 1271 (citing *Rhodes*, 408 F.3d at 568-69).   Plaintiff testified he "freaked out" and was scared, and a reasonable person might well have been chilled by an implied threat of further physical harm, which suffices to raise a triable issue of fact. *Id*. at 1271. (McMaster Depo., 41:21-42:1; McMaster Dec., ¶33.)

Accordingly, the Court recommends that Defendant Carlson's motion for summary judgment on Plaintiff's First Amendment retaliation claim be denied.

## VI. <u>Eighth Amendment Claim Against Defendants Carlson and Garcia</u>

Finally, on June 16, 2014, the Court issued an order that it considered to bring final resolution to the parties' discovery disputes.   (Doc. 78.)   In relevant part, the Court denied Plaintiff's motion to compel an additional supplemental response to his request for the GA 154 form documenting inmate Smedley's move to cell 214 on C Facility, Building 5, on March 18, 2009.   The Court's denial was based on Defendants' representations that they were unable to locate the form and that GA 154 forms are discarded after one year.   It is now clear from the record that the while the GA 154 forms are maintained in the office for only one year, the official

GA 154 form records are maintained in a computer system. (Doc. 82.) Furthermore, the GA 154 form Plaintiff seeks directly impacts his ability to demonstrate a causal connection between Defendant Carlson and/or Defendant Garcia and the assignment of inmate Smedley to his cell on March 18, 2009.[16]  *See Garrett v. City & Cnty. of San Francisco*, 818 F.2d 1515, 1519 (9th Cir. 1987).

Accordingly, the Court recommends that pursuant to Fed. R. Civ. P. 56(d), Defendants Carlson and Garcia's motion for summary judgment on Plaintiff's Eighth Amendment claim against them be deferred pending further order.  *Blough v. Holland Realty, Inc.*, 574 F.3d 1084, 1091 n.5 (9th Cir. 2009) (quotation marks and citation omitted); *Getz v. Boeing Co.*, 654 F.3d 852, 867-68 (9th Cir. 2011); *Tatum v. City and County of San Francisco*, 441 F.3d 1090, 1100-01 (9th Cir. 2006).

## VII.    Order and Recommendation

For the reasons set forth herein, Plaintiff's and Defendants' motions to strike declarations or portions therein are ORDERED DENIED, and the Court RECOMMENDS that Defendants Carlson, Garcia, Sedwick, and Espitia's motion for summary judgment, filed on November 14, 2013, be:

1.    DENIED as to Defendants Sedwick and Espitia's motion for summary judgment on Plaintiff's Eighth Amendment failure-to-protect claim;

2.    DENIED as to Defendants Sedwick and Espitia's motion for summary judgment on Plaintiff's Eighth Amendment failure-to-protect claim on the ground of qualified immunity;

3.    DENIED as to Defendant Carlson's motion for summary judgment on Plaintiff's First Amendment retaliation claim; and

4.    CONTINUED pursuant to Rule 56(d) as to Defendants Carlson and Garcia's motion for summary judgment on Plaintiff's Eighth Amendment failure-to-protect claim.

---

[16] Defendants Sedwick and Espitia's presence in the building and awareness of inmate Smedley's arrival and placement in cell 214 on May 18, 2009, suffice to create triable issues of fact and therefore, Plaintiff does not need the GA 154 form to avoid summary judgment as to Sedwick and Espitia.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).   Within **fifteen (15) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court.  Local Rule 304(b).  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."   Any response to the objections must be filed within **fifteen (15) days** from the date of service of the objections.  Local Rule 304(d).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **September 5, 2014**                              **/s/ Sheila K. Oberto**
UNITED STATES MAGISTRATE JUDGE

24